**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Brian T. Henry | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | |
| Christopher J. Walsh Architects, P.C. | ) | |
|     d/b/a Tandem Architecture, Inc. | ) | **JURY DEMAND** |
| T. Andrews Construction, Inc. | ) | |
|     d/b/a Tandem Construction, Inc. | ) | |
| RL Accelerated, Inc. | ) | |
| | ) | |
| Defendants. | ) | |

_____

**INTRODUCTION**

1.      This complaint alleges that the entities that own, operate, and/or manage the residential rental development in Chicago, Illinois known as Avenir Apartments—Christopher J. Walsh Architects, P.C., doing business as Tandem Architecture, Inc., T. Andrews Construction, Inc., doing business as Tandem Construction, Inc. (collectively, "Tandem") and RL Accelerated, Inc. ("RL Accelerated" and together with Tandem, the "Defendants") —maintained and enforced an illegal and discriminatory tenant selection policy that effectively barred individuals who rely on housing subsidies from living at the development by requiring that all apartment applicants have an income equal to at least three times the monthly rent.  Because the vast majority of individuals who use housing subsidies in Chicago are African American, Defendants' policy has a disproportionate impact on African Americans renters seeking housing in Chicago.  As a result of its impact on people who use housing subsidies, the policy disproportionately harms African Americans seeking housing in Chicago.

2.　　Defendants' discriminatory policy denied Plaintiff Brian T. Henry a unit in Avenir Apartments, a 196-unit residential development located at 730 North Milwaukee Avenue in Chicago, Illinois.　Mr. Henry is an African American man who uses a Housing Choice Voucher to pay for housing.[1]　Mr. Henry grew up in Chicago and was seeking to return from Dubuque, Iowa to Chicago at the time he applied for a unit in Avenir Apartments.　Mr. Henry was seeking to live closer to his family and in particular his mother, who needed his assistance due to her health issues.

3.　　Mr. Henry chose Avenir Apartments because it was offering affordable units in a high-quality new development.　Having grown up in a community where he did not always feel safe, Mr. Henry liked that the development is located in the West Town neighborhood of Chicago, a diverse and safe community.　Mr. Henry was looking forward to living somewhere that he could go for walks at any time of day and live around people from all walks of life.

4.　　Mr. Henry was also attracted to Avenir Apartments because he knew that the building was developed through the City of Chicago's Affordable Requirements Ordinance Program ("ARO Program").　The ARO Program is an inclusionary zoning program through which developers of market-rate housing developments set aside a certain number of units for low- and moderate-income tenants and in return receive benefits from the City in the form of entitlements or approvals, City land purchases, or financial assistance.　The ARO Program is specifically intended to address racial segregation and the City's history of denying housing to people of color in high opportunity communities by developing low- and moderate-income housing in neighborhoods, like West Town, where the market would not create such housing on its own.　Mr. Henry had experienced discrimination when pursuing apartments with his Housing

---

[1] The Housing Choice Voucher program is the largest federal housing subsidy program funded by the Department of Housing and Urban Development and operated locally through the Chicago Housing Authority.

Choice Voucher in the past, but expected that a development that participated in the ARO program would follow fair housing laws.

5. Defendants' refusal to consider Mr. Henry's Housing Choice Voucher rent subsidy when assessing his ability to make his monthly rental payments prevented Mr. Henry from securing housing in Avenir Apartments. Defendants' policy has a disproportionate impact on African Americans, like Mr. Henry, who comprise the vast majority of Housing Choice Voucher holders in Chicago. Mr. Henry now brings this suit against Defendants pursuant to the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3602 et seq., to prevent them from continuing or renewing their discriminatory conduct at Avenir Apartments and to redress the harm that Mr. Henry has suffered as a direct result of Defendants' conduct.

## **NATURE OF THE ACTION**

6. Mr. Henry seeks monetary, declaratory, and injunctive relief against Defendants for engaging in a practice of unlawful discrimination on the basis of race with respect to the Avenir Apartments development.

7. From around February 2020, or earlier, Defendants required that residents' income was at least three times as high as the monthly rent charged at units in Avenir Apartments, a 196-unit residential development located at 730 North Milwaukee Avenue in Chicago, Illinois.

8. As a direct result of Defendants' minimum income requirement, applicants who use housing subsidies like the Housing Choice Voucher are either deterred from ever applying to Avenir Apartments after learning of this requirement; or, like Mr. Henry, are denied housing in Avenir Apartments because of their use of housing subsidies.

3

9. Defendants' minimum income requirement disproportionately impacts African Americans in violation of the Fair Housing Act. As of 2021, eighty-eight percent of households in Chicago that use Housing Choice Vouchers are headed by an African American.[2]

10. The Fair Housing Act prohibits any policy that has a disparate impact on a protected class unless the policy is necessary to achieve a substantial, legitimate, nondiscriminatory business purpose that cannot be satisfied with a less discriminatory alternative.

11. The benefit of participating in the Housing Choice Voucher program is that the federal government, through the Chicago Housing Authority, pays the majority of an individual's rental payment and utilities. Defendants' policy of requiring a Housing Choice Voucher holder, the majority of whose rent will be paid by the federal government, to have an income that is three times greater than the monthly rent, is therefore never necessary to achieve the potentially legitimate interest of ensuring that rental payments will be made each month. Accepting a federally backed housing voucher is an exceedingly low risk source way to ensure rental payment. It also creates a standard that is impossible for many voucher holders to meet as the Housing Choice Voucher is a means-tested benefit. A household that meets the income eligibility requirements of the Housing Choice Voucher program is highly unlikely to have an income that is three times the monthly rent of an apartment when the value of the voucher is excluded.

12. Defendants should have considered an applicant's use of a housing subsidy when assessing the risk of rental payment default. Assessing an applicant's income relative to the

---

[2] Chicago Housing Authority, *CHA Quarterly Report, 1ˢᵗ Quarter 2021*. https://www.thecha.org/about/plans-reports-and-policies/cha-quarterly-reports

portion of the rent for which they would be responsible, if any, is a less discriminatory alternative and would still serve the objective of minimizing the risk of rental payment default.

13.     Mr. Henry brings this action against Defendants to address their illegal and discriminatory conduct and to redress the harm he has suffered as a direct result of that conduct.

## PARTIES

### I.     PLAINTIFF BRIAN T. HENRY

14.     Plaintiff Brian T. Henry is a 36-year-old African American resident and native of Chicago.  Mr. Henry is also a Housing Choice Voucher holder, a housing subsidy funded by the U.S. Department of Housing and Urban Development and administered in Chicago through the Chicago Housing Authority.

### II.     DEFENDANTS

15.     Defendant Christopher J. Walsh Architects, P.C. is a corporation that engages in real estate development and property management doing business as Tandem Architecture, Inc. Its business address is 1040 West Huron Street, Suite 300 in Chicago, Illinois and its address for service of process on file with the Office of the Illinois Secretary of State is c/o Santo P Terenzio, 19 Don Carlos Drive, Hanover Park, Illinois 60133.

16.     Defendant T. Andrews Construction, Inc. is a corporation that engages in real estate development and property management doing business as Tandem Construction, Inc.  Its business address is 1040 West Huron Street, Suite 300 in Chicago, Illinois and its address for service of process on file with the Office of the Illinois Secretary of State is c/o Santo P Terenzio, 19 Don Carlos Drive, Hanover Park, Illinois 60133.

17.     Defendant RL Accelerated is an Illinois corporation that acted as the leasing agent for Tandem at Avenir Apartments during the relevant time period.  It's address for service of

process on file with the Secretary of State is 425 Huehl Road, Building 21, Northbrook, Illinois 60062.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613. This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because the claims alleged herein arise under the laws of the United States.

19. This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

20. Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants are a resident of this district, the subject property that Defendants own, operate or manage is located in the district, and a substantial part of the events of omissions giving rise to the claims occurred in the district.

## FACTUAL BACKGROUND

### I.   AVENIR APARTMENTS AND THE AFFORDABLE REQUIREMENTS ORDINANCE PROGRAM.

21. Defendants own, operate, or manage residential rental properties, including Avenir Apartments, in Chicago, Illinois.

22. Tandem developed Avenir Apartments pursuant to the City of Chicago's ARO Program. Originally adopted in 2007 and updated in 2015 and 2021, the stated purpose of the ARO "is to expand access to housing for low-income and moderate-income households and to preserve the long-term affordability of such housing." Chicago Mun. Code § 2-44-080(A). In passing its 2021 amendments to the ARO, the Chicago City Council emphasized that "decades of exclusion, including by race, class, and disability, make Chicago one of the most segregated cities in the country." City of Chicago Ordinance SO2021-1226 (attached hereto as Exhibit A).

The Council further noted that "the cost of this segregation is high, both for the City's overall economic vitality and for those who find their access to jobs, grocery stores, transit and other opportunities limited by their zip code." *Id*.

23. To inform the most recent amendments to the ARO Program, the City of Chicago Department of Housing convened an Inclusionary Housing Task Force ("Task Force"), which issued a report in September 2020. In its report, the Task Force emphasized that the ARO Program is unique among the City's affordable housing programs "because of its inclusionary mission." *Id.* The Task Force further emphasized, "That mission is crucial because we know that the legacy of racist and classist actions like redlining, contract buying and restrictive covenants has resulted in Chicago's status as one of the most segregated cities in the country." *Id.* The vital purpose of the ARO Program—to address persistent segregation in Chicago, is well known to Tandem as its Development Manager, Jeffrey Hreben, served as a member of the Inclusionary Housing Task Force.

24. Upon information and belief, Avenir Apartments entered the ARO Program under the 2015 version of the ARO. Under that version, ARO requirements apply to any residential housing project of ten or more units developed pursuant to a rezoning of property or a sale of city land, or residential housing projects for which the developer receives financial assistance from the City. Chicago Mun. Code § 2-44-080 (C). In return for receiving one of these benefits, the developer of a residential housing project, such as the Defendant, agrees to make certain affordable and inclusionary housing commitments, including the provision of rental or sale units affordable to low- and moderate-income households for a fixed period of time. Chicago Mun. Code § 2-44-080 (F).

II. **MR. HENRY'S ATTEMPT TO APPLY FOR AN APARTMENT AT AVENIR APARTMENTS AND DEFENDANTS' REJECTION OF HIS APPLICATION**

**PURSUANT TO ITS DISCRIMINATORY MINIMUM INCOME REQUIREMENT.**

### A. Mr. Henry's Interest in Avenir Apartments and Submission of his Application.

25. In October 2019, Mr. Henry lived in Dubuque, Iowa, where he had been for the preceding year. At the time, he began exploring a move to Chicago. Mr. Henry grew up in Chicago and his mother still lived there. She was experiencing health issues, including arthritis and obesity. The arthritis was spreading, making it difficult for her to walk and requiring her to use a motorized scooter. Mr. Henry does not come from a big family and living close to his mother became necessary to ensure that he could help her manage her day-to-day needs.

26. While searching for housing in Chicago, Mr. Henry saw an advertisement on Facebook indicating that affordable units were soon to be available at Avenir Apartments. Mr. Henry was attracted to Avenir Apartments because it was a high-quality new building in an attractive neighborhood. Mr. Henry grew up in a public housing complex where he did not always feel safe and was eager to live in a community where he could go for walks at any time of day. Mr. Henry also liked the prospect of living in a development and community with people from all walks of life and liked Avenir Apartments' proximity to downtown Chicago. It felt like the perfect area for him.

27. Mr. Henry inquired about Avenir Apartments and on November 8, 2019, he received an email message from Xander Clarke, the Regional Leasing Director for Defendant RL Accelerated (attached hereto as Exhibit B). According to Mr. Clarke's email, RL Accelerated was acting as the leasing agent for Tandem, Inc. Mr. Clarke's email stated, "we are excited to start accepting applications for our community opening January 1, 2020." Mr. Clarke also indicated that units would be rented on "a first come, first served basis."

28.     On or about November 15, 2019, Mr. Henry applied for a unit at Avenir Apartments through an online portal and paid a sixty-five-dollar, non-refundable application fee. Mr. Henry checked on the status of his application a week or two later and spoke to Kaitlyn O'Callaghan, Tandem's Property Manager for Avenir Apartments, who informed him that they were still processing applications.

29.     On December 4, 2019, Mr. Henry received an email from Ms. O'Callaghan with a letter attached titled "PRE-APPROVED" (attached hereto as Exhibit C).  In the letter, Ms. O'Callaghan indicated that Mr. Henry's application had been pre-approved and that financial documents would need to be submitted to the Chicago Department of Housing ("Department of Housing") to verify that Mr. Henry met the income qualifications for tenants of affordable units in the ARO program.

30.     Mr. Henry submitted the financial documents on December 16, 2019, for the City's review and indicated, among other things, that his income included $13,740 in public assistance as a result of his Housing Choice Voucher (see Brian Henry Tenant Income Certification, attached hereto as Exhibit D).  Mr. Henry was informed that it would take 7-10 days for the Department of Housing to review his income qualifications.

31.     With the use of his Housing Choice Voucher subsidy, Mr. Henry had sufficient income to allow him to pay for the monthly rent for the unit for which he was applying.

**B.  Defendant's Rejection of Mr. Henry's Application.**

32.     On or about February 3, 2020, Mr. Henry attempted to reach Ms. O'Callaghan by phone to learn the status of his application.  On February 7, 2020, Mr. Henry travelled from Dubuque to Chicago to handle paperwork related to moving, or "porting," his Housing Choice Voucher from Dubuque to Chicago.  Because he had not received a response to his phone call

9

from Ms. O'Callaghan, Mr. Henry stopped by Avenir Apartments on or about February 8, 2020, to inquire about the status of his application. He spoke with Mr. Clarke, who informed Mr. Henry that his application had been denied because of his income. Mr. Clarke told Mr. Henry he would speak to Ms. O'Callaghan and ask her to reach out to Mr. Henry.

33. On February 19, 2020, Ms. O'Callaghan sent Mr. Henry an email. Her message included several attachments that appeared to be prior emails to Mr. Henry from Ms. O'Callaghan but were not messages that Mr. Henry had previously received. One of the attachments, dated February 3, 2020 (attached hereto as Exhibit E), stated, "Thank you for your interest in Avenir. Our residents are required to make at least 3x the monthly rent. After checking your income you do not qualify for the rent."

34. Defendants had not previously communicated this requirement to Mr. Henry, even though he had previously informed them that he intended to use his voucher. Mr. Henry was confused because Defendants had previously pre-approved his application, pending the Department of Housing's review, and because his voucher guaranteed that his rent would be paid each month.

35. Mr. Henry remained interested in renting a unit at Avenir Apartments and hoped that Defendants' rejection of his application was based upon a misunderstanding that could be resolved. On February 25, 2020, Mr. Henry sent an email to Ms. O'Callaghan seeking such resolution (attached hereto as Exhibit F). In his email, Mr. Henry wrote:

> I rent with a Housing Choice Voucher, as you know. This Housing Choice Voucher represents an additional Source of Income (beyond my monthly pay) which obviously provides an ironclad (and in fact government-backed) guarantee that my rent will be paid in full, on time, every month.

Mr. Henry explained in this email that discrimination against voucher holders violated fair housing laws and concluded by writing: "All that said, I have no desire to pursue anything with

10

your company other than an apartment. …I'm formally appealing your rejection of my housing application." Mr. Henry requested a response from Defendant by February 28, 2020.

36. On February 28, 2020, Mr. Henry received an email from Ms. O'Callaghan (attached hereto as Exhibit G) stating: "I have been out sick earlier this week. Please give us until Tuesday [March 3, 2020] to reply."

37. On March 5, 2020, Mr. Henry received another email from Ms. O'Callaghan (attached hereto as Exhibit H) stating: "We are still looking into this matter. I hope to have a response for you soon."

38. On March 30, 2020, Mr. Henry received another email from Ms. O'Callaghan (attached hereto as Exhibit I) stating, "Kaitlyn O'Callaghan sent you a secured document to review and sign." It included a password-protected link that Mr. Henry could not open. Mr. Henry emailed Ms. O'Callaghan indicating that he could not open the document and Ms. O'Callaghan responded that her email account had been hacked and he should disregard the message.

### C. The Impact of Defendant's Policy on Mr. Henry.

39. While still awaiting a response from Defendants to his request to reconsider his application, Mr. Henry began to search for other housing in Chicago. Mr. Henry's lease in Dubuque ended in January 2020, but his landlord agreed to let Mr. Henry stay in his apartment on a month-to-month basis. On April 1, 2020, Mr. Henry's landlord leased his unit to a new, long-term tenant. As a result, Mr. Henry was forced to put his belongings in a storage unit in Chicago and find immediate housing immediately. Mr. Henry used his monetary savings to live in Airbnb units and hotels while he waited for an answer from Defendants and looked for other permanent housing options.

11

40. Defendants never gave Mr. Henry a response to his request to reconsider his application, even though they indicated twice that they would. Finding another apartment proved difficult because of the pandemic. Mr. Henry was unable to see units in person and conducted his apartment search virtually.

41. Mr. Henry ultimately leased an apartment on August 15, 2020. The apartment is farther north and away from downtown than he would have preferred. It is also smaller and not as nice as the apartments offered at Avenir Apartments.

### D. Defendants' Policy Injured Mr. Henry

42. As a result of Defendant's unlawful and discriminatory conduct, Mr. Henry suffered substantial injuries, including emotional distress and out-of-pocket costs. Mr. Henry was dejected after Defendants denied his application and then strung him along after he requested that they reconsider. Mr. Henry loved the apartment and the opportunity to live in a safe, integrated neighborhood. He was happy to be pre-approved by Defendants and was looking forward to moving into Avenir Apartments. He was also glad to be moving closer to his mother, who needed his assistance. Defendants' actions caused Mr. Henry significant emotional distress as he was forced into a month-to-month living situation in Dubuque and then into a series of temporary living situations as he sought a long-term apartment rental in Chicago.

43. In addition to the emotional distress Mr. Henry suffered, he also incurred out-of-pocket expenses. Among other things, he was forced to pay for storage for his belongings, use savings that he had carefully accrued to pay for short-term living arrangements, and incur the costs of a prolonged housing search.

### III. DEFENDANTS' REJECTION OF MR. HENRY'S APPLICATION ON THE BASIS OF THEIR MINIMUM INCOME REQUIREMENT CONSTITUTES UNLAWFUL DISCRIMINATION.

44.     The Fair Housing Act prohibits policies that appear to be neutral on their face but have a disparate impact on the basis of race, unless such policies are necessary to achieve a legitimate business purpose that cannot be satisfied through a less discriminatory alternative practice.  Defendants' minimum income requirement is unlawful under this standard because it effectively bars individuals who rely on Housing Choice Vouchers and other housing subsidies from accessing housing, most starkly and disproportionately impacting African American housing applicants.  Any legitimate interest in ensuring that an applicant's rent and utilities are paid each month can be satisfied through the less discriminatory alternative of considering the value of an applicant's housing subsidy and his or her ability to pay any rent and utility expenses, if any, for which the applicant would be responsible after the subsidy is allocated.

45.     The population of Chicago households that rely on Housing Choice Vouchers to pay for housing is heavily and disproportionately African American.  African Americans make up 29.6% of the City of Chicago's overall population.[3]  At the same time, 36,454 of the 41,277, or 88.3%, of the households that receive a Housing Choice Voucher through the Chicago Housing Authority is headed by an African American.[4]  Conversely, only 1,077 Housing Choice Voucher households in Chicago, or 2.6% of the total number of households, is headed by a White non-Hispanic individual.  *Id.*  As a direct result, African Americans are significantly more likely to be denied housing as a result of Defendants' policy to require all applicants, including those who rely on Housing Choice Vouchers, to earn at least three times the rent.

## CAUSES OF ACTION

## COUNT I
### Disparate Impact in Violation of the Fair Housing Act, 42 U.S.C. § 3604

---

[3] U.S. Census Bureau *QuickFacts – Chicago, Illinois*.  https://www.census.gov/quickfacts/chicagocityillinois
[4] Chicago Housing Authority, *CHA Quarterly Report, 1st Quarter 2021*. https://www.thecha.org/about/plans-reports-and-policies/cha-quarterly-reports

13

46.     Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 41 above.

47.     The federal Fair Housing Act makes it unlawful, among other practices, to "otherwise make unavailable or deny a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(a).

48.     It is also unlawful under the Fair Housing Act to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b).

49.     The Supreme Court affirmed the existence of a disparate impact theory of liability under the Fair Housing Act in *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 135 S. Ct. 2507, 192 L. Ed. 2d 514 (2015).  There are three prongs to a disparate impact claim: (1) to establish a prima facie case, the plaintiff must establish that a challenged practice or policy disproportionately and adversely affects members of a protected class; then (2) once a prima facie case is established, the defendant has the burden of demonstrating that the challenged policy or practice serves a legitimate business interest; and finally (3) the burden reverts to the plaintiff to demonstrate that the defendant's valid interest can be served through a less discriminatory, available alternative.

50.     Defendants' policy of excluding applicants from Avenir Apartments whose income is not at least three times the rent, without consideration of sources of income such as housing subsidies, provides different "terms, conditions, or privileges" of rental housing and also has the effect of "otherwise mak[ing] unavailable or deny[ing] a dwelling" on the basis of race. Even if Defendants' policy related to any valid interest in ensuring that tenants pay their rent and

14

utilities each month, there are less discriminatory alternatives available for assessing applicants for housing at Avenir Apartments that would serve the same purpose.

51. Defendants' conduct has an adverse and disproportionate impact on African Americans in Chicago as compared to similarly situated Whites. This adverse and disproportionate impact is the direct result of Defendants' policy in that it effectively bans individuals who rely on Housing Choice Vouchers.

52. The application of the minimum income requirement harmed Mr. Henry, an African American, by denying him housing, causing him to suffer emotional distress and housing instability, and causing him to incur out-of-pocket expenses.

## DEMAND FOR JURY TRIAL

53. Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court grant him the following relief:

(1) Enter a declaratory judgment finding that the foregoing actions of Defendants violate 42 U.S.C. § 3604;

(2) Enjoin Defendants from engaging in the foregoing illegal conduct now and in the future;

(3) Award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for injuries caused by Defendants' conduct alleged herein;

(4) Award Plaintiff his reasonable attorney's fees and costs pursuant to 42 U.S.C. § 3613(c)(2);

15

(5)       Award pre- and post-judgment interest to Plaintiff, as provided by law; and

(6)       Order such other relief as this Court deems just and equitable.

Dated: February 2, 2022

Respectfully submitted,

By: /s/ Charles F. Smith
_____

Charles F. Smith
Jordan M. Blain
Shiva Kooragayala
155 North Wacker Drive, Suite 2700
Chicago, IL 60606-1720
Telephone: (312) 407-0700
Facsimile: (312) 407-0411
Email: charles.smith@probonolaw.com
jordan.blain@probonolaw.com
shiva.kooragayala@probonolaw.com

Gavin Kearney
Aneel L. Chablani
CHICAGO LAWYERS' COMMITTEE FOR CIVIL
 RIGHTS
100 N. LaSalle Street, Ste. 600
Chicago, IL 60602
Telephone: (312) 202-3659
Facsimile: (312) 630-1127
Email: gkearney@clccrul.org
achablani@clccrul.org

*Attorneys for Plaintiff Brian T. Henry*

16